IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **MARTHA KINARD, Regional Director of** | § | |
| **the Sixteenth Region of the National** | § | |
| **Labor Relations Board, for and on behalf** | § | |
| **of the NATIONAL LABOR RELATIONS** | § | |
| **BOARD,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **v.** | § | **Civil Action No.: 4:16-cv-00952-O** |
| | § | |
| **DISH NETWORK COMPANY,** | § | |
| | § | |
| **Respondent.** | § | |

## ORDER

Before the Court is the Petition for Injunction Under Section 10(j) of the National Labor Relations Act, as Amended (ECF No. 1), filed October 17, 2016, by Martha Kinard, Regional Director of the Sixteenth Region of the National Labor Relations Board, for and on Behalf of the National Labor Relations Board ("Petitioner").  Petitioner seeks an injunction prohibiting the alleged unfair labor practices of DISH Network Company ("DISH"), pending the final disposition of these matters, which are currently pending before the National Labor Relations Board (the "Board").

Having considered the petition, related briefing, and relevant law, the Court finds that the petition should be and is hereby **GRANTED in part** and **DENIED in part**.

## I.     BACKGROUND

The factual recitation is taken largely from Petitioner's and Respondent's briefs in support and opposition.  ECF Nos. 7, 19.  The Communication Workers of America (the "Union") represents technicians and warehouse employees at DISH's Farmers Branch and North Richland

1

Hills, Texas facilities. The two units were organized in 2009. No other DISH employees at any facility are represented by a union.

### A.      Wage History

In 2009, prior to certification of the Union at the two facilities, DISH introduced a pilot compensation program called Quality Performance Compensation ("QPC") for technicians at Farmers Branch, North Richland Hills, and a few other facilities. QPC provided a low base wage with a large incentive program. Technicians disliked QPC. According to DISH, animosity with QPC led to certification of the Union. Resp.'s Br. Opp. 6, ECF No. 19.

DISH was soon unsatisfied with QPC and it instituted a new pay program entitled Performance Incentive Plan ("Pi") for its technicians at all its facilities except Farmers Branch and North Richland Hills. Pi offered a higher base wage than QPC with a smaller incentive program. Because DISH and the Union were bargaining for a new contract at the time DISH switched to Pi, the two Union facilities were required to remain under QPC, as it was the status quo at the time the Union was certified. *See, e.g., NLRB v. Dothan Eagle, Inc.*, 434 F.2d 93, 98 (5th Cir. 1970) ("[W]henever the employer by promises or by a course of conduct has made a particular benefit part of the established wage or compensation system, then he is not at liberty unilaterally to change this benefit either for better or worse during the union campaign or during the period of collective bargaining.").

DISH and the Union began bargaining in July 2010 and continued until November 20, 2014. During this time unit technicians' earnings under QPC ballooned. QPC paid employees based on performance metrics that DISH was unable to adjust due to collective bargaining. As DISH improved its processes and technologies, DISH technicians were able to complete tasks more quickly and thus earn more under the QPC incentive program. As a result, the wages of unit

2

technicians increased by about $17,000 between 2013 and 2015.  Resp.'s Br. Opp. 9, ECF No. 19.

In 2015, Union members were making, on average, $19,000 more than their non-unionized peers.

*Id.* at 9–10.  Thus, by the time face-to-face bargaining between DISH and the Union ceased in

November 2014, DISH was eager to remove QPC, while the Union was intent to preserve it.  The

parties' bargaining history is best understood against this background.

      **B.**     **Bargaining History**

As the bargaining history is central to Petitioner's claim in this case, the Court recounts the

history in some detail.  The last in-person bargaining sessions between DISH and the Union

occurred on November 18, 19, and 20, 2014.  The lead negotiators at this point were Sylvia Ramos

for the Union and George Basara for DISH.  On November 18, 2014, the Union presented a

proposal that was rejected by DISH, and on November 19, 2014, DISH presented a proposal that

was rejected by the Union.

Another bargaining session was scheduled for December 8, 2014.  Then Ramos suffered a

death in the family and was unable to attend the scheduled session.  Union Attorney Matt Holder

informed Basara on December 4, 2016, that the Union would be unable to make the December 8

session and proposed dates in January and February 2015 for rescheduling.  App. 1418, ECF No.

8.  Basara replied by stating that if the Union was unable to meet, and did not provide a proposal

in writing, DISH would consider bargaining to be at an impasse.  *Id.*

Ramos responded later the same day, stating that the Union did not normally negotiate via

email but under the circumstances the Union would send back a counterproposal in writing.  App.

1421–23.  Ramos also clarified that the email did not waive the Union's right to bargain in person.

App. 1423.  On December 9, 2014, Ramos sent the written counterproposal via email.  App. 1587.

Basara then once again inquired about meeting in December and Ramos informed him that she

had no dates available until January.  App. 1424–29.

On December 18, 2014, Basara sent Ramos an email stating that he believed bargaining to be exhausted and he attached DISH's "last, best, and final offer."  App. 1355–59.  He asked that the Union take the proposal to its members and inform him if the proposal was accepted, at which time they would consider further bargaining.  App. 1359.

Ramos responded that the Union had not waived its right to bargain in person and insisted on meeting and bargaining over its counterproposals.  App. 1382–84.  The next day, December 31, 2014, Basara informed the Union by email that he was resigning from his law firm and that his partner Brian Balonick would be taking over.  App. 1385.  Basara resigned from his firm in January 2015.

The Union did not attempt to contact Balonick, DISH's new lead negotiator, during all of 2015, nor did Balonick attempt to contact the Union.   Ramos stated at the administrative hearing that she did not reach out to Balonick because she did not have his contact information and she knew he had a trial in January 2015 and would need time to familiarize himself with the parties' history.  App. 489.  Balonick stated that he believed the Union was not interested in reaching an agreement and was stalling.  App. 116.  He believed that the Union knew DISH's position and there was an expectation that it would respond, either by contacting the company or filing an unfair labor practice charge.  *Id.*

Then, on January 8, 2016, Balonick first contacted the Union.  App. 1389.  He stated in a letter to Ramos that DISH's previous last offer on November 19, 2014, remained DISH's final offer and that he believed further bargaining would not be productive.  *Id.*  Ramos replied on January 13, 2016.  App. 1391.  She recounted the bargaining history from her perspective and requested that Balonick send her dates for bargaining.  App. 1391–93.

4

On February 2, 2016, Balonick replied via email.  App. 1411.  He reiterated his belief that the parties were at "a standstill" and asked Ramos to explain her position that the parties were not at an impasse.  *Id*.  On February 3, 2016, Ramos restated her request to bargain in person and Balonick did not respond for two months.  App. 1431.

On April 4, 2016, Balonick emailed Ramos stating that, no later than April 23, 2016, DISH would implement its last, best, and final offer, unless the Union offered a written explanation of why the Union believed the parties were not at an impasse.  App. 1413–16.  In this email, Balonick identified the December 2014 offer as DISH's last, best, and final offer.  App. 1413.

The Union filed the original charges in this matter on April 7, 2016.

## C.    Implementation of Final Offer

On April 5 and 6, 2016, DISH held meetings where it announced to employees that it was implementing its last, best, and final offer, which included a new wage rate for technicians and a new healthcare policy.  One employee at the North Richland Hills facility quit the day of the announcement.

Prior to the meeting at North Richland Hills on April 6, 2016, Field Service Manager Hanns Obere inadvertently sent a text message about the changes intended for someone else to unit technician Kenneth Daniel.  Among other things, the text message said that the Union was "gone" and that the Farmers Branch and North Richland Hills offices were gradually closing.  App. 1454–56. Obere wrote, "They would rather have the techs quit en mass [sic]."  App. 1456.  The message was disseminated to other North Richland Hills employees.  Mem. Supp. Pet. 17, ECF No. 7.

On April 23, 2016, DISH implemented the wage changes for technicians, but no wage change for warehouse employees, who are also represented by the Union.  The new healthcare policy took effect in July 2016.  Technicians' wages were cut by approximately 50%.  *Id*.  Level

5

4 technicians previously making an average of $30.60 per hour under QPC, now made $17.00 per hour with no incentive program.  *Id.*; Pet.'s Trial Ex. 2.  The rates at unit facilities are lower than at any other facility in the region.  *Id.*

Since the April 23, 2016 implementation of new wage rates, 16 technicians at North Richland Hills have resigned and one technician at Farmers Branch has resigned.  The record suggests these employees quit because of the cut in wages.  *Id.*  Some took other jobs with comparable wages but no benefits.  *Id.*  Others went to lower paying or similar paying jobs which offered more hours or the possibility of advancement.  *Id.*  DISH has hired some replacement employees.

At some point following the wage change, North Richlands Hills Operations Manager Waeland Thomas told employees not to discuss the Union or QPC with the new employees while at work.  There is no written account of this statement and accounts of what was said vary.  At the very least, Mr. Thomas stated that DISH would survey new employees after training and training technicians could suffer consequences if the survey reported that the new employees were made uncomfortable by talk of the Union.  Some unit employees understood Thomas to say they were prohibited from discussing the Union with new employees in any context and discussing it could lead to termination.

### D.     Procedural Posture

On June 23, 2016, Martha Kinard, the Regional Director for Region 16 of the Board, on behalf of the General Counsel, issued an Order Consolidating Cases, Consolidated Complaint, and Notice of Hearing against DISH for numerous alleged violations of the National Labor Relations Act (the "NLRA" or "Act") arising out of the above facts.  On July 22, 2016, the Regional Director issued an Order Further Consolidating Cases, Second Consolidated Complaint, and Notice of

Hearing consolidating additional related cases.  A hearing on all cases convened before an administrative law judge of the Board from August 8, 2016, through August 11, 2016.  The hearing reconvened from September 28, 2016 through September 30, 2016.

Petitioner filed the petition for injunctive relief under § 10(j) of the NLRA on October 17, 2016.  ECF No. 1.  After briefing completed (ECF Nos. 7–8, 19, 21, 26), the Union sought leave to file an Amicus Curiae brief, which the Court granted.  ECF Nos. 27–30.  DISH filed a reply. ECF No. 32.  The Court held a hearing on the equitable necessity of injunctive relief in this case on January 6, 2017.  Min. Entry, ECF No. 53.  The petition is now properly before the Court.

## II.    LEGAL STANDARD

Petitioner seeks an injunction under § 10(j) of the NLRA.  Section 10(j) provides:

> The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

29 U.S.C. § 160(j).  In issuing an injunction under § 10(j) a district court considers only two factors: "(1) whether the Board, through its Regional Director, has reasonable cause to believe that unfair labor practices have occurred, and (2) whether injunctive relief is equitably necessary, or, in the words of the statute, 'just and proper.'" *McKinney ex rel. NLRB v. Creative Vision Res., LLC*, 783 F.3d 293, 296–97 (5th Cir. 2015) (citing *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1188–89 (5th Cir. 1975)).  Each prong must be established with "reasonable clarity."  *Id.* at 297–98.

"In determining whether reasonable cause exists to believe that unfair labor practices have been committed, the district court need only decide that the Board's theories of law and fact are

not insubstantial or frivolous." *Pilot Freight Carriers*, 515 F.2d at 1189 (citing *Boire v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of America*, 479 F.2d 778 (5th Cir. 1973); *Samoff v. Bldg. and Constr. Trades Council*, 475 F.2d 203 (3d Cir. 1973); *San Francisco-Oakland Newspaper Guild v. Kennedy*, 412 F.2d 541 (9th Cir. 1969); *Schauffler v. Local 1291*, 292 F.2d 182 (3d Cir. 1961)).  The Eleventh Circuit has elaborated that this standard requires the Board to "present enough evidence in support of its coherent legal theory to permit a rational factfinder, considering the evidence in the light most favorable to the Board, to rule in favor of the Board." *Arlook v. S. Lichtenberg & Co., Inc.*, 952 F.2d 367, 371–72 (11th Cir. 1992) (citing *Pascarell v. Vibra Screw Inc.*, 904 F.2d 874, 882 (3d Cir. 1990); *Kobell v. Suburban Lines, Inc.*, 731 F.2d 1076, 1085 (3d Cir. 1984)).

The "just and proper" element is satisfied when: "(1) the employer's alleged violations of the NLRA and the harm to the employees or to the union are concrete and egregious, or otherwise exceptional; and (2) those harms, as a practical matter, have not yet taken their adverse toll, such that injunctive relief could meaningfully preserve the status quo among the employer, the union, and the employees, that existed before the wrongful acts occurred." *Creative Vision*, 783 F.3d at 298. Stated differently, "[t]he NLRB must show, and the district court must find, that the unfair labor practice, in the context of that particular case, has caused identifiable and substantial harms that are unlikely to be remedied effectively by a final administrative order from the NLRB." *Id.* at 299.  The district court is required to "articulate specific reasons to justify the issuance of an injunction based on the facts of the specific case." *Id.* at 302.   And the court may not rely on "speculative and generalized harms." *Id.*

## III.   ANALYSIS

The Court first addresses the reasonable cause prong then considers whether injunctive

relief is "just and proper."

A.    **Reasonable Cause**

Petitioner alleges that DISH: (1) coerced and threatened employees in violation of § 8(a)(1) of the Act; (2) set new retaliatory and discriminatory wage rates resulting in the constructive discharge of Union employees in violation of § 8(a)(3); and (3) unilaterally decreased employees' wages and changed employees' health insurance without first bargaining in good faith with the union to "impasse" in violation of § 8(a)(5).  The Court first considers the third allegation— whether Petitioner has reasonable cause to believe that the parties were not at an impasse and DISH's implementation of its last proposal was, therefore, unlawful.

"As a general rule, unilateral changes in the terms and conditions of employment instituted by an employer during contract negotiations without consultation with the Union constitute failure to bargain collectively in violation of § 8(a)(5)."  *Huck Mfg. Co. v. NLRB*, 693 F.2d 1176, 1186 (5th Cir. 1982) (citing *NLRB v. Katz*, 369 U.S. 736 (1962); *NLRB v. J.P. Stevens & Co., Inc., Gulistan Div.*, 538 F.2d 1152, 1162 (5th Cir. 1976); *NLRB v. Tex-Tan, Inc.*, 318 F.2d, 472, 482 (5th Cir. 1963)).  However, if the parties reach a genuine impasse, "the employer is free to implement changes in employment terms unilaterally so long as the changes have been previously offered to the Union during bargaining."  *Id.* (footnotes and citations omitted).

"A genuine impasse in negotiations exists only where the parties have exhausted all avenues for reaching agreement and there is 'no realistic possibility that continuation of discussion at that time would have been fruitful.'"  *Circuit-Wise, Inc.*, 309 NLRB 905, 918 (1992) (quoting *Am. Fed'n of Television Artists, AFL-CIO, Kansas City Local v. NLRB*, 395 F.2d 622, 628 (D.C. Cir. 1968)).  Factors considered in determining if an impasse exists are: "[t]he bargaining history, the good faith of the parties in negotiations, the importance of the issue or issues as to which there

is agreement, [and] the contemporaneous understanding of the parties as to the state of the negotiations . . . ." *Id.* Once an impasse exists, it can subsequently be broken if something "creates a new possibility of fruitful discussion." *Raven Servs. Corp. v. NLRB*, 315 F.3d 499, 505 (5th Cir. 2002) (quoting *Gulf States Mfg. v. NLRB*, 704 F.2d 1390, 1399 (5th Cir. 1983)).

DISH contends that the parties were at an impasse as early as November 2014 and extending into April 2016. As an impasse can exist or erode based on past history and new developments, the Court considers the existence of impasse sequentially.

Initially, the Court finds that Petitioner has reasonable cause to believe that the parties had not reached an impasse as of November 2014. DISH's then-counsel Basara scheduled another bargaining session with the Union in December 2014 and DISH demonstrated movement by agreeing to allow technicians to participate in the Smart Home Sales Incentive program. *See O'Reilly Enterprises, Inc.*, 314 NLRB 378, 380 (1994) (finding no impasse where employer's counsel stated the employer was willing to meet again); and *Shangri-La Health Care Ctr.*, 288 NLRB 334, 334 (1988) (finding no impasse where parties had scheduled an additional negotiating session).

If the parties were not at an impasse as of November 2014, Basara was not privileged to condition face-to-face bargaining on the written exchange of proposals, as he did in the emails exchanged in December 2014. *Compare Nat'l Labor Rel. Bd. v. United States Cold Stor. Corp.*, 203 F.2d 924, 928 (5th Cir. 1953) (employer not privileged to precondition bargaining on the exchange of written proposals where an impasse was broken by a subsequent strike); *Fountain Lodge, Inc.*, 269 NLRB 674 (1984) (employer not privileged to condition bargaining on exchange or written proposals where parties had not engaged in any face-to-face bargaining); *with Holiday Inn Downtown-New Haven*, 300 NLRB 774, 775 (1990) (employer privileged to condition further

bargaining on the exchange of written proposals where parties had negotiated in good faith and were clearly at an impasse).  While Ramos did send a written proposal on December 9, 2014, she clearly stated that the Union had not waived its right to meet and discuss the proposal "face-to-face."  App. 1423.  On such facts, it is reasonable for Petitioner to believe that DISH was not privileged to declare an impasse predicated upon the Union's December 9, 2014 proposal or DISH's December 18, 2014 proposal.

Further, even if an impasse did exist after the written exchange of proposals, DISH's change in lead negotiator on December 31, 2014, and the subsequent passage of a year without negotiation potentially opened the possibility of new fruitful discussion, therefore, making it reasonable for Petitioner to believe impasse had eroded as of January 8, 2016, when Balonick first contacted Ramos.  *See Raven Servs. Corp.*, 315 F.3d at 505 (considering "the mere passage of time" as a factor relevant to determining if an impasse is broken) (citing *Gulf States Mfg.*, 704 F.2d at 1399) (finding change in new Union head suggested possibility of "fruitful negotiations"); *Gulf States Mfg.*, 704 F.2d at 1399 (citing the passage of four years' time as factor eroding impasse); *Airflow Research & Mfg. Corp.*, 320 NLRB 861, 862 (1996) (citing the passage of one years' time and change in Union's representative as factors eroding impasse).

If there was no impasse as of January 8, 2016, Balonick was not privileged to condition bargaining on a vote by unit employees or a written explanation showing that the parties were not at an impasse.  *See United States Cold Stor. Corp.*, 203 F.2d at 928 (employer not privileged to precondition bargaining on the exchange of written proposals where an impasse was broken by a subsequent strike); *In Re Jano Graphics, Inc.*, 339 NLRB 251, 251 (2003) ("[T]he Respondent's continued insistence on a nonmandatory subject of bargaining—the ratification vote by unit employees—and its refusal to bargain on and after . . . tainted any subsequent impasse.").

Therefore, Petitioner has reasonable cause to believe that the parties were not at an impasse when DISH implemented its "last, best, and final offer" on April 23, 2016, and that DISH thus violated § 8(a)(5) by unilaterally decreasing employees' wages and altering employees' health insurance without first bargaining in good faith with the union to impasse.

As the unilateral wage-change allegation is the core of Petitioner's complaint and is sufficient to support the only injunctive relief the Court finds to be equitably necessary, as outlined below, the Court assumes without finding that Petitioner has reasonable cause to believe that DISH also committed the other alleged violations.

The Court now turns to the second prong of the § 10(j) inquiry—whether injunctive relief is "just and proper."

**B.      Equitable Necessity**

The NLRB seeks an injunction requiring DISH to (1) restore all unit employees to the pre-implementation wages and healthcare benefits enjoyed prior to April 23, 2016; (2) offer interim reinstatement to constructively discharged employees to their jobs with the pre-implementation wages and healthcare benefits they enjoyed prior to April 23, 2016; and (3) bargain in good faith with the Union.  Pet. 11–12, ECF No. 1.  For the following reasons, the Court concludes that it is just and proper to restore all unit employees to pre-implementation wages, but all further injunctive relief is not equitably necessary.  *See Pilot Freight Carriers*, 515 F.2d at 1193 ("If the trial court, in its discretion, does not believe that far-reaching mandatory relief would serve the purposes of the Act, it need not grant the full remedy requested by the Board.")

The Court discusses each request for relief in turn.

1.      <u>Restoring All Unit Employees to Pre-Implementation Wages</u>

The "just and proper" element of the § 10(j) inquiry is satisfied when petitioner establishes

that the "alleged violations of the NLRA and the harm to the employees or to the Union is concrete and egregious, or otherwise exceptional." *Creative Vision*, 783 F.3d at 298. "To constitute 'egregiousness' . . . a labor practice must lead to exceptional injury, as measured against other unfair labor practices." *Id*. at 299.

Here, Petitioner alleges that DISH unlawfully and unilaterally cut technicians' wages by an average of 50%. Mem. Supp. Pet. 19. For example, unit employees went from earning, on average, approximately $23 to $32 per hour to earning $13 to $17 per hour. *Id.* at 13. Such a drastic cut is exceptional, without reference to any other allegations in Petitioner's brief.

Egregiousness is further established by the fact that the unit technicians' new wage rates are lower than all other non-union technicians in the region. *See* Pet.'s Trial Ex. 2. For example, Level 4 technicians at the Farmers Branch and North Richland Hills facilities, on average, make more than $5 less per hour than technicians at the North Texas facilities with the next two lowest hourly rates. *Id.* (normalized rate for FSS4 at Farmers Branch, $17.81; North Richland Hills, $17.52; Fort Worth, $23.36; Waxahachie, $23.53). Notably, unit employees are not included in any incentive program, unlike their North Texas peers. *Id.* DISH has not provided any justification for this differential and, without such, improper retaliation seems the most likely explanation.[1]

The Court's conclusion is not altered by evidence that the wages unit technicians were making under QPC were above market rate. *See, e.g.*, Resp.'s Trial Ex. 5. Even if technicians' wages under QPC were higher than unit technicians could have earned in similar employment, DISH was still bound by the lawful requirements of the NLRA. Therefore, if Petitioner's

---

[1] Petitioner also highlighted comments Basara made at early bargaining not at issue here.as evidence of retaliatory intent and, therefore, egregiousness. DISH filed Respondent's Motion for Leave to Supplement the Record (ECF No. 49), seeking to submit the investigative files related to the unfair labor charges arising out of these comments in order to challenge Petitioner's portrayal of events. Because the Court does not rely on Basara's comments in this Order, DISH's Motion for Leave to Supplement the Record (ECF No. 49) is **DENIED as moot**.

allegations are correct, which the Court has found Petitioner has reasonable cause to believe they are, the simple fact is DISH unlawfully cut unit employees' hourly wages by half.  It is not appropriate, in this context, for the Court to dismiss such a drastic change in the employees' conditions by weighing in on what the technicians should or should not have been making based on the market.

Petitioner also demonstrated that both the unit employees and the Union have been and continue to suffer identifiable and substantial harm as a result of the wage cut.  *Creative Vision*, 783 F.3d at 299 ("[I]njunctive relief should issue when harms are ongoing, yet incomplete and likely further to harm the union or its supporters in the workforce.").  At the hearing, several unit technicians testified as to the financial difficulties they and others are confronting because of the reduced wages.  While there is evidence that the technicians were instructed that such testimony would help their case, the Court finds their testimony credible.  Anyone would struggle to realign his or her finances after suffering an unexpected 50% reduction in income.  House and car payments that one may easily afford at $30 to $34 per hour can quickly become unsustainable at $17 per hour.

Petitioner likewise provided sufficient evidence to show that the Union has suffered and continues to suffer injury through diminishing support as a result of the wage reduction.  This diminishment is both in numbers and morale.  At the North Richland Hills facility, 16 technicians have resigned since the wage reduction and the record strongly suggests more intend to do so.  Mem. Supp. Pet. 19.  While only one technician has resigned at the Farmers Branch facility, Petitioner presented testimony evidence that others intend to quit if QPC is not restored in the near future.

The Court acknowledges that the weight of technicians' testimonies regarding their and

14

others' future plans is lessened by the speculative and hearsay nature of some of the testimony. Similarly, the meaning of the resignation numbers is clouded by DISH's evidence that the attrition rate at Farmers Branch in 2016 was the lowest in the region, and the rate at North Richland Hills was relatively average.  Resp.'s Trial Ex. 2 (Farmers Branch attrition rate in 2016, 19%; North Richland Hills, 86%; Denton, 101%; Arlington/Ft. Worth, 91%; Waxahachie, 49%; Weatherford, 53%; McKinney, 80%; Sunnyvale, 88%).  However, the Court finds that enough current unit technicians testified as to their own financial difficulties and plans to seek alternative employment to credit the claim that Union membership will continue to erode without the restoration of QPC.

If unit technicians do not resign at the rate Petitioner suggests, there remains substantial evidence that support for the Union among existing members continues to deteriorate. Union representative Thomas Schaffer, whose job responsibilities include measuring Union support, stated that the Union was "on the brink" of losing all support.  This claim is supported by a text-message exchange between DISH technicians at the Farmers Branch facility, in which one unit employee suggests, if somewhat facetiously, that unit technicians throw out the Union in exchange for back pay.[2] Pet.'s Trial Ex. 3 ("So who wants to contact dishes lawyers and tell em to back pay us and pay us the same as everyone else and we will vote the union out.").  Another set of text messages showed one technician complaining of getting "disappointing news from a VERY

---

[2] On January 4, 2017, Petitioner filed a Motion for Protective Order to Limit Discovery Pursuant to Fed. R. Civ. P. 26(c)(1) (ECF No. 44), seeking a protective order for these and other text messages that were produced during discovery.  Petitioner argues unit employees are at risk of retaliation for the content of the text messages if DISH attorneys share the messages with DISH. The next day DISH filed a response opposing the protective order on the grounds that it would prohibit DISH from using the messages at the hearing, which occurred on January 6, 2017.  As DISH was able to offer a page of the text messages into evidence at the hearing and there are no further evidentiary hearings in the matter, DISH's objection is moot.  Therefore, the Court finds that Petitioners Motion for Protective Order (ECF No. 44) should be and is hereby **GRANTED**. The protective order shall issue by separate order.

disappointing union." Resp.'s Trial Ex. 12 (emphasis in original). And as further evidence, one former technician testified that he would not return to DISH, even if QPC were restored, because he did not trust the Union to protect his wages.

DISH sought to undermine this evidence by tying some of the disfavor for the Union to the Union's failure to communicate with the units and the Union's giving the units false hope that the issue would be resolved quickly. The Court is unpersuaded. Even if the Union did err as DISH sought to demonstrate, the record does not support a finding that failures in communication are the cause of technicians' frustration. Technicians' testimonies and the submitted text messages make clear that technicians' number-one concern and frustration was and remains wages. Unit technicians' perception that the Union failed to prevent a 50% reduction in their wages is clearly the but-for cause of unit employees' disillusionment with the Union.

Given the concrete possibility of Union dissolution—arising either from a loss of numbers or loss of morale, or some combination thereof—the Court finds that injunctive relief preventing further injury and restoring the status quo as it relates to wages is necessary in order to preserve the remedial powers of the NLRB. *Creative Vision*, 783 F.3d at 299 (quoting *Overstreet v. El Paso Disposal, LP*, 625 F.3d 844, 851 (5th Cir. 2010)) ("§ 10(j) relief is only appropriate when 'any final order of the NLRB would be meaningless and the remedial purposes of the Act will be frustrated without an injunction to preserve the status quo.'").

### 2.    Restoring All Unit Employees to Pre-Implementation Healthcare

The Court is less persuaded that restoring all unit employees to pre-implementation healthcare is equitably necessary. Petitioner argues that "because health insurance deductibles have more than doubled for the employees [under the new plan], both employees and their families may be forced to delay or forgo medical treatments." Mem. Supp. Pet. 53. This is exactly the type

of speculative harm the Fifth Circuit rejected in *Creative Vision*.  783 F.3d at 299 (critiquing the Ninth Circuit's holding in *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180 (9th Cir. 2011) for relying substantially on "speculative and generalized harms" to support issuance of a § 10(j) injunction).  The speculative harm that an increase in deductibles may potentially require unit employees or their families to delay or forgo medical treatment does not satisfy the requirement under *Creative Vision* that the harm be identifiable and substantial.  *Id.*

Petitioner provided little beyond this statement to show that the healthcare changes resulted in any harm to employees or to the Union.  Similarly, DISH technicians provided little to no testimony regarding any harm arising from the healthcare changes.  Therefore, Petitioner's request to restore all unit employees to pre-implementation healthcare is denied.

### 3.     Reinstating All Constructively Discharged Employees

Petitioner also seeks reinstatement of those employees who resigned as a result the wage change.  "Ordinarily, courts properly leave the decision whether to reinstate [employees] to the Board."  *Overstreet*, 625 F.3d at 856 (citing *Pilot Freight Carriers*, 515 F.2d at 1192).  However, courts may order reinstatement in "exceptional cases," "so as to prevent the destruction of employee interest in collective bargaining, irreparable injury to the union's bargaining power, and the undermining of the effectiveness of any resolution through the Board's process."  *Id.*  Petitioner has failed to establish that this is such an exceptional case.

Nearly nine months have passed since DISH implemented the wage change, decreasing the equitable necessity of reinstatement.  *Pilot Freight Carriers*, 515 F.2d at 1193 (finding that the Board waiting three months before petitioning for an injunction was "some evidence that the detrimental effects of the discharges have already taken their toll").  Further, while Petitioner showed that, despite the passage of time, many of the former employees are willing to return if

QPC is restored, Petitioner failed to show that the anti-union sentiment arose out of the alleged constructive discharge of these employees, or that reinstatement is necessary to restore the strength of the Union.  By contrast, in *Overstreet v. El Paso Disposal, LP*, the rare case in which the Fifth Circuit found reinstatement appropriate under § 10(j), the ALJ and the district court had both found that "discharge of [] strikers and failure to reinstate them was a direct cause of the anti-Union sentiment among the workers that led to several petitions to decertify the Union . . . ." 625 F.3d at 856.  The record supports no such finding here.

Additionally, there is no need to reinstate former unit technicians to preserve the Board's remedial powers.  Nearly all technicians who testified via affidavit that they would return if QPC were restored noted that they are making less, or "significantly less," at their new employment than they made under QPC.  Pet.'s Trial Ex. 4.  If that is the case, these former employees would be just as likely to return after a final order from the Board, as they are now.

Therefore, the Court finds that reinstatement of allegedly constructively discharged employees is not equitably necessary and Petitioner's request is denied.

4.      Bargain in Good Faith

Lastly, Petitioner requests an order requiring DISH to bargain in good faith, but Petitioner has not alleged any refusal to bargain on the part of DISH nor shown any other continuing unfair labor practices requiring such relief.  There is no evidence that DISH has refused to bargain with the Union after declaring impasse and imposing the new wage reduction.  In fact, Ramos conceded at the hearing that outside of settlement discussions, the Union has not requested to bargain with DISH at all.

The only unfair labor practices actually alleged by Petitioner, beyond DISH's implementation of the changes, are the text message from Hans Obere and the comment by

Waeland Thomas.  Assuming these events were the violations Petitioner alleges, they do not amount to more than one time violations.  *See Creative Vision*, 783 F.3d at 299 ("[I]njunctive relief should issue when harms are ongoing, yet incomplete and likely further to harm the union or its supporters in the workforce.").

Nine months out from the Obere text message, both the Farmers Branch and North Richland Hills facilities are still open and both offices continue to engage in hiring.  Resp.'s Br. Opp. 36.  There is no evidence that anyone has been encouraged to transfer out of those offices. *Id.*  DISH's regional director testified that there are no plans to close either facility.  *Id.*  And there is no evidence that similar statements have been made since.  Therefore, the Court finds there is no ongoing harm resulting from the Obere text message.

There is also no evidence that Mr. Thomas's comment was part of a concerted, ongoing effort to discourage Union participation or discussion, nor is there enough evidence to suggest that the comment did in fact discourage Union participation or support.  The record suggests that Mr. Thomas's comments—whatever their actual content—and their subsequent interpretation were a result of misunderstanding, not mal-intent.  Further, there is no evidence that anyone has been disciplined for discussing the Union during work hours or after work hours, as the alleged comment suggested.

As there is no evidence of any other ongoing unfair labor practices that threaten to weaken the Union or harm unit employees, there is no need for injunctive relief to preserve the Board's remedial power.  Any harm resulting from the text message or Thomas's comment has occurred and Petitioner's allegations arising from those events are currently before the Board in the administrative proceeding.  The Board is in the best position to determine the proper remedy, if any, for such harm.  Therefore, Petitioner's request for an order requiring DISH to bargain in good

faith is denied.

## IV.    CONCLUSION

Based on the foregoing, Petitioner's request for injunctive relief (ECF No. 1) is **GRANTED in part** and **DENIED in part**.

The Court hereby **ORDERS** Respondent DISH Network Company to (1) on a prospective basis, immediately restore to all unit employees the pre-implementation wages they enjoyed prior to the DISH Network Company's alteration of their terms and conditions of employment on April 23, 2016; (2) post a copy of this Order in all locations where notices to employees are generally posted at the Farmers Branch and North Richland Hills facilities; and (3) provide a hard copy of this Order to all unit employees.

All further requested injunctive relief is hereby **DENIED**.

**SO ORDERED** this **14th day** of **January, 2017**.


Reed O'Connor
**UNITED STATES DISTRICT JUDGE**